Filed 10/6/15  In re J.A. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.A. et al., Persons Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ERICA P.,<br><br>  Defendant and Appellant. | F071108<br><br>(Super. Ct. Nos. JD131580-00, JD131581-00)<br><br><br>**OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Kern County.  Louie L. Vega, Judge.

Maureen L. Keaney, under appointment by the Court of Appeal, for Defendant and Appellant.

Theresa A. Goldner, County Counsel, and Jennifer E. Feige, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]       Before Kane, Acting P. J., Poochigian, J. and Franson, J.

Erica P. (mother) appeals from the juvenile court's order summarily denying her petition for modification under Welfare and Institutions Code section 388[1], through which she sought further reunification services. She also appeals from the juvenile court's order terminating her parental rights to her children J.A. and U.A. Mother contends the juvenile court erred in concluding that the beneficial relationship exception to adoption was not established. We affirm.

### STATEMENT OF FACTS AND PROCEDURE

*Detention*

In October of 2013, the department filed a section 300 petition alleging J.A. and U.A. were at risk of harm based on mother's failure to protect them from ongoing domestic violence in the home caused by an older sibling, her provision of illegal controlled substances to the children's older siblings, and mother's own substance abuse. Mother and her six children[2] lived with the maternal grandparents following mother's release from jail. The children were taken into protective custody.

The report prepared in anticipation of detention chronicled several visits with mother and the children in response to referrals of general neglect. In July 2013, the social worker described mother as being unable to control her children who cussed and yelled at everyone, including their grandparents. Maternal grandmother wanted mother and the children out of the house as they provided no support for themselves and were disruptive to the neighbors as well. One of the older children, V.M., became angry at

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] The six children consisted of V.M., then 16 years old; A.M., then 13½ years old; S.M., then nine years old; E.M., then eight years old; J.A., then 4½ years old; and U.A., then 1 year and 9 months old. Santos M. is the father of the oldest four children; Ernesto A. is the father of the younger two. Neither of the fathers is a party to this appeal; the oldest four children are not subject children of this appeal.

mother, slammed doors, yelled, cussed, and got into an argument with younger sister A.M. V.M. pushed both mother and A.M. and the sheriff's department was contacted.

A referral in August 2013 reported that V.M. had been physically abused and verbally assaulted by her boyfriend. When the social worker met with mother, mother stated she was surprised that V.M.'s boyfriend would hurt V.M. and that she had allowed the boyfriend to stay in the home with them to keep V.M. from running away. Mother had trouble controlling J.A. and U.A., who were present during the interview, and, at one point, J.A. cussed at mother when she did not do what he wanted her to.

The social worker spoke to V.M. at school. V.M. stated she smoked marijuana one to two times a week and that mother knew of her drug use but did not approve of it. V.M. acknowledged past physical altercations with her boyfriend.

The social worker spoke with E.M. at his school. E.M. reported seeing violence between V.M. and her boyfriend on numerous occasions. E.M. stated that V.M. and her boyfriend smoked marijuana daily and that mother did not mind because they would give her weed in exchange for "blunt wraps." According to E.M., he and his brother S.M. take care of J.A. and U.A. while mother and siblings were under the influence of marijuana. E.M. said mother bought marijuana from someone in an orange car.

The social worker next spoke to S.M. at his school. S.M. stated he had observed yelling and altercations between V.M. and her boyfriend. S.M. also reported that mother, V.M. and her boyfriend smoke marijuana.

When the social worker later returned to the home to speak with mother, the apartment was empty and the door locked "as if the residents had been evicted." At the beginning of October 2013, the social worker was able to locate mother and the children in a new apartment. Mother acknowledged that she was still allowing V.M.'s boyfriend into the home even though he was told by the "court" that he was not to have contact with V.M. Mother also acknowledged her own daily marijuana use, that she was aware V.M. smoked marijuana, and that A.M. "might."

3.

The social worker then spoke with V.M., who stated she had been suspended from school for ditching. She reported smoking marijuana with A.M. V.M. stated that mother gives her money, which she uses to buy the marijuana. Mother acknowledged that she knew V.M. used the money she gave her to buy marijuana. A.M. also acknowledged her own and mother's marijuana use. According to A.M., the younger children are left with V.M. while mother smokes marijuana, because V.M. is not in school. A.M. also reported that mother allowed A.M.'s 13-year-old boyfriend to spend the night at their house.

The children were taken into protective custody on October 4, 2013.

At the detention hearing October 8, 2013, the juvenile court found the petition true and the children were detained and placed temporarily in the care, custody and control of the department. Supervised visits with mother were ordered to occur weekly for one hour.

*Jurisdiction*

The report prepared in anticipation of jurisdiction stated V.M. and A.M. were, at that time, on "Runaway Status." The report also stated mother had been arrested on October 21, 2013, for possession of a stolen vehicle. She was released after her arraignment two days later. Mother failed to attend an October 29, 2013, appointment at the department.

At the November 6, 2013, jurisdiction hearing, counsel for the department requested that the dependency action regarding V.M. and A.M. be dismissed without prejudice because both were on runaway status. The petition was amended to change the statement that mother "allowed" the children to smoke marijuana to state she had "knowledge" of such. The statement that mother "gives" V.M. money to buy marijuana was stricken. Mother then submitted on the petition and the juvenile court found the allegations of the petition as amended true as to the younger four children. Disposition was set for December 12, 2013.

4.

*Disposition*

The report prepared in anticipation of disposition stated mother admitted to PCP use the day prior to the children's removal in October, and a subsequent drug test confirmed THC, PCP and methamphetamine use. Following detention, mother was advised to immediately enroll in her case plan components. Although she enrolled in substance abuse treatment on November 7, 2013, she had missed several sessions.

Disposition was eventually held on January 9, 2014. The children were adjudged dependents of the juvenile court, removed from mother's physical custody and placed in the care of the department for placement. Mother was ordered to participate in counseling for parenting, substance abuse counseling and drug testing. Mother was advised that, due to the age of the children, failure on her part to cooperate and avail herself of services could result in termination of her parental rights after six months. Weekly supervised visits for mother were continued. A six-month review hearing was set for July 9, 2014.

*Six-Month Review*

At the July 9, 2014, hearing, the department recommended termination of services to mother for the younger two children, J.A. and U.A., and continuation of services for the older two children, S.M. and E.M., who were not placed with the younger two. Mother's counsel stated she would submit on the recommendation for S.M. and E.M., but would object as to J.A. and U.A. Counsel for the children brought up the issue that there was an ICPC[3] approved for transfer of J.A. and U.A. out of state. Counsel asked that a hearing be held on that issue if the foster parents planned on moving. The juvenile court continued the six-month review hearing until August 6, 2014.

---

[3]     ICPC refers to the Interstate Compact on Placement of Children. (See Fam. Code, § 7900 et seq.)

The continued review hearing was eventually scheduled for September 23, 2014. The report prepared in anticipation of that hearing recommended continuation of services as to S.M. and E.M. and termination of services as to J.A. and U.A. According to the report, mother had made no progress toward alleviating or mitigating the causes for the children's out-of-home placement. She enrolled in substance abuse treatment November 7, 2013, but was discharged February 7, 2014, "before completing" the program, due to non-compliance, her random drug screens, and attendance protocols. Mother failed to drug test for the entirety of the review period and disclosed to the social worker that she continued to use marijuana every other day. Mother was referred to a visitation coach, but was unable to redirect the children's behavior when needed. In addition, J.A. and U.A. were placed together in a foster home in October of 2013, and the caretakers were committed to adopting them.

At the review hearing, the juvenile court continued services as to S.M. and E.M. and found continued out-of-home placement appropriate and necessary. As for J.A. and U.A., the juvenile court terminated reunification services, finding mother failed to make progress or participate in her court-ordered reunification plan and set a section 366.26 permanency planning hearing for January 21, 2015.

*Section 388 Petition*

The permanency planning hearing was rescheduled for February 23, 2015. In the interim, on February 9, 2015, mother's counsel filed a section 388 petition alleging changed circumstances. The petition requested reinstatement of reunification services because mother had enrolled and was actively participating in substance abuse counseling. She had attended 10 of 12 sessions with good progress and drug tested regularly and clean since November 21, 2014. According to mother, reinstatement of reunification services would allow her to "keep the family together and would prevent the sibling group from being split up." Attached to the petition was a progress report from

her substance abuse counselor indicating an expected completion date for mother of May 17, 2015.

On February 13, 2015, the juvenile court summarily denied mother's section 388 petition, finding no change of circumstances.

*Section 366.26 Permanency Planning*

The adoption assessment done in anticipation of the hearing stated J.A. and U.A. had been in only one placement since being removed from mother's care. Between detention in October of 2013 and December 2014, mother attended 32 of 63 possible visits with J.A. and U.A. J.A. and U.A. both saw the caregivers as their primary parental figures. The social worker opined the benefits of adoption for both J.A. and U.A. outweighed any detriment if their relationship with mother was severed. The children left visits with mother without any incidence of crying or sadness and expressed happiness at seeing their caregivers. J.A. referred to his caregivers as "mom" and "dad" and stated his desire to be adopted, although he wanted to continue to visit mother. The social worker opined that, if the current caregivers were unable to adopt, it would not be difficult to secure another adoptive home for J.A. and U.A.

At the section 366.26 permanency planning hearing on February 23, 2015, mother's counsel objected to termination of parental rights, arguing that severing the bond between mother and the children would be detrimental because there was a strong bond between them. Counsel argued that, while mother's visits were not consistent in the beginning, they now were.

The juvenile court found the children's best interests were in having a permanent home. It found the bond between mother and J.A. and U.A. was "not to the extent that it would be detrimental to the children should that relationship be severed." The juvenile court found the children were likely to be adopted. Mother's parental rights to J.A. and U.A. were terminated.

## DISCUSSION

### I. DENIAL OF SECTION 388 PETITION

Mother contends the juvenile court erred by summarily denying her section 388 petition in which she sought reinstatement of reunification services. In mother's view, the evidence established that she made significant changes in her sobriety and it was in the children's best interests "to reunify, keep the family together and prevent the sibling set from being separated." For reasons discussed below, we conclude the juvenile court did not abuse its discretion.

*Applicable Law*

Family reunification services play a crucial role in dependency proceedings. (*In re Alanna A.* (2005) 135 Cal.App.4th 555, 563.) When a child is removed from the physical custody of his or her parent, the juvenile court is required, with limited exceptions, to offer or provide reunification services to the child's parents. (§ 361.5, subd. (a).) Reunification services for a parent of a child under three years of age at detention may be limited to six months if the parent has not participated regularly and made substantial progress in a court-ordered case plan and there is not a substantial probability that the child may be returned to his or her parent by the 12-month review hearing. (§§ 361.5, subd. (a)(1)(B), 366.21, subd. (e).) Here, mother was given six months of reunification services before the juvenile court terminated them as to J.A. and U.A.

Under section 388, a parent or any interested person may petition the court to change, modify or set aside a previous order "upon grounds of change of circumstance or new evidence." (§ 388, subd. (a)(1).) To succeed on a section 388 petition, a parent must show changed circumstances establishing that the proposed modification would be in the "'best interests'" of the child. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 526.) "The parent seeking modification [through a section 388 petition] must 'make a prima facie showing to trigger the right to proceed by way of a full hearing. [Citation.]' [Citations.]

8.

There are two parts to the prima facie showing: The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children. [Citation.] If the liberally construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing. [Citation.]" (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)

> ### *Standard of Review*

We review the juvenile court's decision to deny mother's section 388 petition without a hearing for abuse of discretion. (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.) We may not reweigh the evidence or substitute our judgment for that of the juvenile court. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 319 (*Stephanie M.*).) We affirm the order unless it """"exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." [Citations.]'" (*Brittany K., supra,* at p. 1505.) The juvenile court's decision will not be disturbed unless the court """"has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]."' [Citations.]" (*Stephanie M., supra,* at p. 318.)

> ### *Analysis*

The juvenile court denied mother's section 388 petition on the grounds, "[t]he request does not state new evidence or a change of circumstances." At a subsequent hearing on another matter, the juvenile court reiterated that the 388 petition had been denied because it did not see "where circumstances had changed …."

Mother asserted the following change of circumstances or new evidence to support her section 388 petition: she was enrolled and actively participating in substance abuse counseling; she had attended 10 of the 12 sessions "in her intensive outpatient treatment with reported high participation and good progress"; and she had been "drug testing clean and regularly since November 21, 2014". Attached to mother's petition was a progress

report from the Kern County Mental Health Substance Abuse System of Care dated February 3, 2015, which stated, during the reporting period between January 1, 2015, and February 3, 2015, mother attended 10 of the 12 scheduled sessions. The progress report stated mother's level of participation was "high"; her overall progress "good"; and her expected date of completion May 17, 2015. Also attached were negative drug test results from November 20, 2014; December 16 and 23, 2014; and January 5 and 15, 2015.

We conclude the juvenile court did not abuse its discretion in denying a full evidentiary hearing on the petition. Significantly, mother waited until two weeks before the rescheduled section 366.26 hearing to file the petition. We agree with the juvenile court that on the issue of changed circumstances, the petition alleged at most changing circumstances, i.e., a recently renewed effort to address the problems that led to J.A. and U.A.'s dependency by participating in a substance abuse program designed to address some of her issues.

Mother simply does not have a sufficient track record of effectively addressing her drug abuse issues. Mother had a lengthy substance abuse problem, involving multiple illegal, controlled substances and had enrolled in substance abuse treatment on multiple occasions. Mother failed to drug test for the entirety of the review period and disclosed to the social worker that she continued to use marijuana every other day. Between September 2014, when the juvenile court terminated reunification services because mother failed to make any progress, and the section 388 petition in February of 2015, mother had done little but re-enroll in substance abuse treatment and begin treatment. She was not expected to complete her current program until May of 2015.

At most, mother's recent sobriety shows that she was attempting to address the issue and was in the process of changing. However, evidence of "changing circumstances" is insufficient to obtain relief under section 388. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) Even a showing of great effort to make improvements will not necessarily be persuasive when a parent has an extensive history of drug use. (*In re*

10.

*C.J.A.W.* (2007) 157 Cal.App.4th 1075, 1081 [affirming the denial of a section 388 petition when the parents' efforts at drug rehabilitation were only three months old at the time of the section 366.26 hearing]; *In re Mary G.* (2007) 151 Cal.App.4th 184, 205-206 [mother's very recent treatment for drug abuse and bipolar disorder was not a prima facie case of changing circumstances] *Casey D., supra,* at pp. 47-49 [affirming denial of a section 388 petition when mother with an extensive history of drug use had been drug free for only a few months and had not completed her treatment program].)

Even if mother had made a prima facie showing of changed circumstances, she failed to make a prima facie showing that the relief she requested in her section 388 petition would be in J.A. and U.A.'s best interests. "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.]" (*Stephanie M., supra,* 7 Cal.4th at p. 317.) In determining whether the modification is in the child's best interest, the juvenile court should consider a number of factors, including: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F., supra,* 56 Cal.App.4th at p. 532.) This list is not meant to be exhaustive. (*Ibid.*)

The only evidence mother offered in support of her section 388 petition was her assertion: "Family reunification services would give the mother and her children an opportunity to reunify. Services would keep the family together and prevent the sibling group from being split up." Although mother made a recent effort at addressing her substance abuse issue in the few months leading to the section 366.26 hearing, she failed

11.

to address it at all during the reunification period, even though she was told that period would be short. Thus she failed to meaningfully address the seriousness of the problems which led to the dependency proceedings.

Mother also failed to address the strength of the relative bond between J.A. and U.A. and mother, on the one hand, and J.A. and U.A. and their caregivers in their current placement. Although mother voices some concern about various incidents which occurred while the children were with the caretakers, these issues were ameliorated over time as J.A. received counseling. J.A. and U.A. were placed together in a foster family home in October of 2013 when they were first detained and remained with those caregivers, who were committed to adopting both J.A. and U.A.

Mother's petition did not provide prima facie evidence of either changed circumstances or best interests of the children. The juvenile court did not abuse its discretion by summarily denying the section 388 petition.

## II. BENEFICIAL RELATIONSHIP EXCEPTION TO ADOPTION

Mother also contends that juvenile court erred in concluding that the beneficial relationship exception to adoption was not established when it terminated her parental rights. We disagree.

### Applicable Law

At a permanency planning hearing, once the juvenile court finds by clear and convincing evidence that the child is likely to be adopted within a reasonable time, the court is required to terminate parental rights and select adoption as the permanent plan, unless the parent shows that termination of parental rights would be detrimental to the child under one of several statutory exceptions. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).) One of these statutory exceptions is the beneficial relationship exception to adoption, which applies when it would be detrimental to the child to terminate parental rights in that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

12.

(§ 366.26, subd. (c)(1)(B)(i).)  The burden is on the party seeking to establish the beneficial relationship exception to produce evidence establishing the exception is applicable.  (*Bailey J., supra,* at p. 1314.)  Once the juvenile court finds that a parent has met his or her burden to establish the requirements of the beneficial relationship exception are present, the juvenile court may chose a permanent plan other than adoption if it finds the beneficial relationship to be "a compelling reason for determining that termination would be detrimental to the child."  (§ 366.26, subd. (c)(1)(B); see *Bailey J., supra,* at p. 1314.)

The parent-child relationship exception occurs when a significant parent-child relationship is found to exist.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)  The juvenile court must then engage in a balancing test, juxtaposing the quality of the relationship and the detriment involved in terminating it against the potential benefit of an adoptive family.  (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425; see also *In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154-1156.)

Interaction between the natural parent and the child will always confer some incidental benefit to the child.  (*Autumn H., supra,* 27 Cal.App.4th at p. 575.)  But a showing that the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent is not sufficient where that relationship does not meet the child's need for a parent.  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348, 1350.)  Significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.  The relationship arises from day-to-day interaction, companionship and shared experiences.  (*Autumn H., supra,* at p. 575.)

A parent's failure to progress beyond monitored visitation with a child and to fulfill a "meaningful and significant parental role" justifies an order terminating parental rights.  (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1109.)  "It would make no sense to

forgo adoption in order to preserve parental rights in the absence of a real parental relationship." (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1350.)

The factors to be considered when looking for whether a relationship is important and beneficial are: "(1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. omitted.) "[F]or the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt." (*Id.* at p. 468.)

### *Standard of Review*

Because there is some confusion by the parties about the appropriate standard of review, we set it out in detail here. On appeal after a court has rejected a parent's effort to establish the exception, two different standards of review apply. (See *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 (*K.P.*); *Bailey J., supra,* 189 Cal.App.4th at p. 1314.) Since the parent must show the existence of a beneficial parental relationship, which is a factual issue, we uphold a court's express or implied finding that there is no beneficial relationship if supported by substantial evidence. (*K.P, supra,* at p. 621; *Bailey J., supra,* at p. 1314.) More specifically, a challenge to a court's failure to find a beneficial relationship amounts to a contention that the "undisputed facts lead to only one conclusion." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1529.) Thus, unless the undisputed facts establish the existence of a beneficial parental relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed. (*Bailey J., supra,* at p. 1314.)

The second requirement for the exception is that the beneficial parental relationship constitute a "compelling reason for determining that termination would be detrimental …." (§ 366.26, subd. (c)(1)(B); *K.P., supra,* 203 Cal.App.4th at p. 622.) Although grounded in the facts, the court's determination of this issue is a

14.

"'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.] Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies." (*Bailey J., supra,* 189 Cal.App.4th at p. 1315; see also *K.P., supra,* at p. 622.)

For instance, when a parent has had custody of the children and visited consistently when she did not have custody, and had an established bond recognized by the agency workers, substantial evidence supports the first prong of the application of the statutory exception. (*K.P., supra,* 203 Cal.App.4th at p. 622.) The determination then becomes whether under the facts of the case, there is a compelling reason for the court to order a plan other than adoption, and whether the court abused its discretion in failing to do so. (*Id.* at pp. 622-623.) In simplest terms, the establishment of the beneficial parental bond exception depends upon a parent having developed such a beneficial bond that it would be detrimental to sever it. The benefit from continuing with the parent would outweigh any benefit to the child derived from his or her adoption. (§ 366.26, subd. (c)(1)(B)(i); *Autumn H., supra,* 27 Cal.App.4th 567, 575.)

### *Analysis*

Mother argues she established both prongs of the parental relationship exception, and that the record in this case is supportive that her children would best benefit from a continued relationship with her.

We conclude mother's limited contact with her children failed to satisfy even the initial prong of the beneficial parent-child relationship exception to termination of her parental rights. Between detention in October 2013 and December 18, 2014, mother attended only 32 of 63 possible visits with the children. She had, according to the social worker, attended more consistently in the last six months than in the initial six months, but even then did not always arrive on time and continued to miss some visits.

Even if we were to find that mother maintained regular visitation with the children, satisfying the second prong requires the parent to prove that "severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed. [Citations.] A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.]" (*In re Angel B., supra,* 97 Cal.App.4th at p. 466.) Mother argues that there was a strong bond between her and the children and that visits went well. But evidence that a parent has maintained "'frequent and loving contact' is not sufficient to establish the existence of a beneficial parental relationship." (*Bailey J., supra,* 189 Cal.App.4th at pp. 1315-1316.)

"To trigger the application of the parental relationship exception, the parent must show the parent-child relationship is sufficiently strong that the child would suffer detriment from its termination." (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449.) A beneficial relationship is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) The existence of this relationship is determined by "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs .…" (*Id.* at p. 576.)

At the time of the termination hearing, J.A. was almost six years old and U.A. had just turned three years old. Both children spent one year and four months out of mother's custody, a significant amount of time in their young lives. By the time of the termination hearing, there was no evidence in the record that the children would suffer detriment if the parent-child relationship was severed. Instead, both children considered the prospective adoptive parents as the primary parental figures in their lives. J.A. called his caretakers "mom" and "dad" and wished to be adopted. The prospective adoptive parents

were said to have consistently met the needs of the children since their placement and were committed to providing them with stability. They wished to adopt the children.

Mother claims that a beneficial relationship existed, sufficient to overcome the statutory preference for adoption, noting specifically J.A.'s actions of giving mother a chocolate rose on Mother's Day. Mother notes that, while this action is "trite taken alone," it is "more loving and heartfelt than the prospective adoptive mother's statements regarding J.A. …[who] stood arms folded across her chest informing the social worker she needed a respite day because of J.A." and that she was "sick of J.A." and he got "on her nerves." Mother is referring to an incident which occurred in January of 2014, only three months after detention, when J.A. failed to inform the caregiver that U.A. filled her diapers and made a mess trying to clean herself. J.A., who watched U.A. make the mess, told the caregiver he did not tell her "on purpose." A discussion between J.A. and the social worker suggested J.A. used the term "on purpose" incorrectly, leading to a misunderstanding on the part of the caretaker. When the social worker explained this to the caretaker, the caretaker stated that J.A. was "a good kid but his attitude changes after he sees his mother." After detention, J.A. exhibited some behavioral issues. He was diagnosed with Post Traumatic Stress Disorder and as a victim of physical abuse and neglect, which he suffered while in mother's custody, and had been in counseling since.

We find that there is substantial evidence to support the juvenile court's findings that J.A. and U.A. would not suffer detriment from termination of the parent-child relationship, and that maintaining the relationship would not promote their well-being "'to such a degree as to outweigh the well-being the child[ren] would gain in a permanent home with new, adoptive parents.' [Citation.]" (*In re Amber M.* (2002) 103 Cal.App.4th 681, 689.)

While mother has demonstrated that she cares for her children and has an affectionate relationship with them, she has not demonstrated an ability to provide for the children, over the long-term, with a stable, safe and loving environment. Accordingly,

the juvenile court properly found there was no beneficial relationship sufficient to overcome the statutory preference for adoption.

## DISPOSITION

The juvenile court's orders are affirmed.